(C.D. 2560)

JULIUS GOLDFARB  
ISRAEL MENCHACA } *v.* UNITED STATES

United States Customs Court, Third Division

(Decided August 4, 1965)

*Glad & Tuttle* (*Edward N. Glad* of counsel) for the plaintiffs.  
*John W. Douglas*, Assistant Attorney General (*Sheila N. Ziff*, trial attorney), for the defendant.

Before DONLON and RICHARDSON, Judges

DONLON, Judge: These six protests were consolidated on trial at Laredo, Tex. The protests claim that processed strawberries, product of Mexico, which as imported were packed in jars and cans, were not properly classified by the collector. He classified the importations as edible berries, prepared or preserved, not specially provided

for, under modified paragraph 736, and charged duty on the merchandise at 14 per centum ad valorem. The protest claim is that the merchandise is specially provided for; that it is jam, within the *eo nomine* enumeration of paragraph 751; and that duty should be assessed at the rate of 9½, 9, or 8½ per centum ad valorem, as applicable under modified paragraph 751 on the respective dates of the several importations.

Both parties introduced evidence. The official papers are of record. One witness testified for plaintiffs. Defendant likewise adduced the testimony of one witness.

A 20-ounce empty jar, labeled "pure strawberry preserves," is in evidence, as being illustrative of a jar in which some of the processed strawberries of these importations were packed. (Illustrative exhibit 1.) The imported merchandise was packed also in 4-pound jars and in so-called number 10 cans. Defendant introduced a letter, discussed in our opinion. (Exhibit A.) However, there is in evidence no sample representative of the imported merchandise, with the consequence that the court is without benefit of visual examination.

The crux of plaintiffs' case is that the strawberries of these importations were processed in Mexico in the manner and to the condition of the article commonly known as jam and so enumerated in paragraph 751, and that such processing was necessary to conform to requirements of the Food and Drug Administration for importation of the merchandise. At the times of these importations, the relevant regulations of the Food and Drug Administration (21 CFR § 29.3), which plaintiffs cite, provided as follows:

**§ 29.3  Preserves, jams; identity; label statement of optional ingredients.**

(a)  The preserves or jams for which definitions and standards of identity are prescribed by this section are the viscous or semisolid foods each of which is made from a mixture composed of not less than 45 parts by weight (see paragraph (c) of this section) of one of the fruit ingredients specified in paragraph (b) of this section to each 55 parts by weight (see paragraph (e)(1) of this section) of one of the optional saccharine ingredients specified in paragraph (d) of this section. * * *

\*          \*          \*          \*          \*          \*          \*

Such mixture, with or without added water, is concentrated by heat to such point that the soluble-solids content of the finished preserve is not less than 68 percent if the fruit ingredient [strawberry] is specified in Group I of paragraph (b) of this section, and not less than 65 percent if the fruit ingredient is specified in Group II of paragraph (b) of this section. The soluble-solids content is determined by the method prescribed in "Official Methods of Analysis of the Association of Official Agricultural Chemists," Seventh Edition, page 322 [Ed. note, 8th edition, 1955, p. 344, sec. 20.15], under "Soluble Solids in Fresh and Canned Fruits, Jams, Marmalades, and Preserves—First Action," except that no correction is made for water-insoluble solids.

\*          \*          \*          \*          \*          \*          \*

(f)   The name of each preserve or jam for which a definition and standard of identity is prescribed by this section is as follows:

(1)   If the fruit ingredient is a single fruit, the name is "Preserve" or "Jam," preceded or followed by the name or synonym whereby such fruit is designated in paragraph (b) of this section.

Plaintiffs further argue that these processed strawberries meet the Department of Agriculture grading standard for jams and preserves which standard is prescribed in 7 CFR, section 52.1118(b) (A), as follows:

Fruit preserves (or jams) that possess a good consistency may be given a score of 17 to 20 points. "Good consistency" means that the fruit or fruit particles are dispersed uniformly throughout the product; that the product is a tender gel or may possess no more than a very slight tendency to flow, except that a slightly less viscous consistency may be present when the fruit is chiefly in the form of whole or almost whole units; and that in the following kinds the product does not have a macerated or pureed appearance but in appearance and eating quality consists of whole units or pieces of fruit particles as indicated for the respective kinds, either singly or in combination with any other kind:

\*          \*          \*          \*          \*          \*          \*

(6)   Strawberry:   Whole or almost whole berries or combinations thereof.

Mr. Julius Goldfarb, the importer, testified that for about 30 years he has been in the business of processing and preserving mayonnaise, pickles, potato chips, and peanut butter; that he has also processed jellies and jams over a period of years "off and on." (R. 4.)   He described himself as an experienced buyer and seller, and one who supervised the production of products for his business.

Consistent with the regulations of the Department of Agriculture, Mr. Goldfarb testified that the formula which was used to process the strawberries of these importations consisted 55 percent of sugar and 45 percent of fruit (in this case, the strawberries) ; that these ingredients were put into a steam jacketed kettle, together with pectin, and that some sugar and citric acid were added.   When this mixture reached a soluble-solids content of 68 percent (to meet the requirement of the regulations for strawberries), it was poured into jars and cans.

The witness saw no distinction between what are called preserves and what are called jams.   The processed strawberries, so he had observed, were used as a spread on bread in restaurants, bakeries, and in homes.   The 20-ounce jars and the 4-pound jars were sold to retail stores for resale to consumers, and the cans were sold to wholesalers for sale to restaurants and hotels.

No attempt was made in the processing to retain the berry shape. Mr. Goldfarb testified that there are some jams in which the shape of the fruit shows, and some jams where it does not show.

Attached to each protest entry is a statement, filed pursuant to a

requirement of the Internal Revenue Code, section 3507, on all invoices of commodities containing 10 percent or more by weight of manufactured sugar. This statement is for use by the customs authorities. (T.D. 49867.) These statements, as filed with the entry invoices of protests 62/9159 and 62/4853, state that as to the merchandise of those entries 55 kilos of refined cane sugar were used for each 45 kilos of fresh strawberries, plus pectin and citric acid added. This is the sugar-fruit ratio as to which Mr. Goldfarb testified. However, as to the entries of protests 63/19467, 63/19468, 63/19469, and 63/19470, the section 3507 statement shows 39 kilos of refined cane sugar to each 39 kilos of fresh strawberries, that is to say, a 50–50 sugar-fruit ratio in the processed strawberries of those entries.

Mr. Cesar A. Farias, a customs examiner at Laredo, testified for defendant. He advisorily classifies, for the collector, fruits such as strawberries. He said that he was familiar with the merchandise of these protests, having examined representative samples taken from the shipments. In his examination, he emptied the contents of a container into a flat vessel, in order to get a better look at the contents. What he found was, for the most part, whole berries in a thick syrup. There were some half berries in the mixture, and these appeared to have been slit open; to a lesser extent, there were also pieces or bits of berries. The majority of the strawberries in the containers he examined, however, were whole berries. The syrup, as he observed, was quite thick.

On cross-examination, Mr. Farias said that, at the times of these importations, he had not had any occasion to examine shipments of strawberry preserves imported by others. He did not use a sample of strawberry jam for comparison with this merchandise or as the basis for his examination. The merchandise which he examined showed a like physical consistency, despite the difference in formulae recited in the section 3507 statements that were filed with the entries. He did not recall testing berries to determine whether they were hard or soft; he might have done so. The berries were firm enough so that he could separate them from the syrup with a knife. He did not count the berries in any sample. Seeds from the strawberries might have been mingled in the syrup, and he did find that some pulp was noticeable in the syrup.

Defendant's exhibit A is a letter identified by witness Goldfarb as having been sent by him over his signature. It is dated June 15, 1957, and addressed to Israel Menchaca, Customhouse Broker in Laredo. From this letter, we quote the following language descriptive of processing under the sugar-fruit ratio formulae used, that is, the 55–45 formula and the earlier 50–50 formula.

With reference to our recent telephone conversation, the following is from start to finish as to the manner in which we are preparing our preserves.

The strawberries are brought to the plant in crates and they are then stemmed (that is the green caps are removed from the berries). The berries are then thoroughly washed and inspected for defects. We then weigh 6½ kilos of berries and we put them in a can, into which is added 6½ kilos of sugar. We then take 6 of these cans which contain a total of 39 kilos of strawberries and 39 kilos of sugar; these are then dumped into a steam jacketed kettle. We then add an additional 7 kilos of sugar and 20 grams of pectin.

The above is then cooked to 213 deg. F. or until the product reaches a reading of 69% solids on the refractometer. The cooking process is then stopped and a small amount of citric acid is added to the product. This varies from one or two ounces to the batch, as strawberry preserves should contain an acidity of about 3.2 P.H. The product is then removed from the kettle and packed into jars hot and then capped. It then goes through a cooling process.

The above batch will make approximately 115–20 oz. jars.

The above formula consists of the following:

        46 kilos of sugar_____ 55%
        39 kilos of strawberries_____ 45%
        20 grams of pectin
        1 or 2 ounces of citric acid

During the cooking process no attempt is made to keep the strawberries whole or in their natural state. Some of the fruit will remain whole and some will fall apart. As a matter of fact after an irrigation the strawberries will not remain as firm, due to the moisture in the strawberry.

In our original formula we used 50% sugar and 50% strawberries; consequently most of the fruit remained whole during the cooking process and there was very little jelly. Under the 55%–45% formula due to the additional amount of sugar there is more of a jam-like consistency.

If you will refer to the letter we received from the Treasury Department, you will note that the new formula consists of a product that they call "Jam" but as far as the Food and Drug is concerned the product may be labeled "Pure Strawberry Preserves".

The competing tariff provisions are as follows:

Paragraph 736, as modified by the General Agreement on Tariffs and Trade (T.D. 51802):

Berries, edible:
    In their natural condition or in
        brine:

        *          *          *          *          *          *          *

        Prepared or preserved, or frozen,
            and not specially provided for:

        *          *          *          *          *          *          *

        Other_____ 14% ad val.

Paragraph 751, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade (T.D. 54108):

Jellies, jams, marmalades, and fruit
    butters:

        *          *          *          *          *          *          *

Currant and other berry [9½% ad val. effective June 30, 1956
9% ad val. effective June 30, 1957
8½% ad val. effective June 30, 1958.]

\* \* \* \* \* \* \*

There is no question that these are strawberries. There is no question that they are prepared or processed. The question is, are they strawberries that are "not specially provided for" in other tariff enumerations, so that the modified paragraph 736 enumeration is applicable; or are they the article of commerce known as jam, for which modified paragraph 751 makes *eo nomine* provision. An *eo nomine* provision will control classification, as against a "not specially provided for" enumeration, provided the merchandise is described by the *eo nomine* enumeration.

While we have not had opportunity of inspecting the merchandise, it appears from the representative empty jar, introduced into evidence by plaintiffs (exhibit 1), that the label under which these strawberries were packed, imported, and sold described them as "preserves." The word "preserves" does not occur in paragraph 751. As we read plaintiffs' brief, the argument is that the word preserves, in common meaning, is synonymous with, or at least that it is comprehended within, the tariff term jam.

Both parties, in their briefs, cite *Allied Food Corp. of Am.* v. *United States*, 39 Cust. Ct. 111, C.D. 1914. The merchandise there was described as a plastic papaya jelly base. The component materials were 55 percent sugar and 45 percent papaya, which was the ratio of such ingredients required by the Food and Drug Administration for jams and jellies.

Like the merchandise here, the papaya-sugar mixture, in proper ratio, was placed in a steam jacket kettle and heated until the soluble solids, by weight, produced a consistency for jam that is required by Government regulations. Unlike the merchandise here, which was packed and imported after being thus processed, the papaya product was then further processed so as to cause the liquid to evaporate, leaving a plastic jelly base. In that condition, it was imported. When used, water was added and the jelly base and water mixture was boiled, thus reconstituting the article to its preevaporation consistency.

The collector classified the plastic papaya jelly base as refined sugar that had been tinctured, colored, or in some way adulterated. On the facts of record there, we held that, in its form as imported, the jelly base was not a jam and, therefore, not directly classifiable as such under paragraph 751; but that it was a concentrate of jam which, when reconstituted with water and boiling, was a jam. Accordingly, following the authority of *Cresca Co., Inc.* v. *United States*, 38 Cust. Ct. 211, C.D. 1864, we held that the imported plastic papaya jelly

base was an unenumerated article, dutiable under paragraph 751 by similitude to jam.

The article now before us is not, of course, a product that uses papaya as the fruit component. The fruit component here is strawberries. It is defendant's contention that, in the *Allied* case, the decisive fact was that the flesh of the papaya fruit had turned to pulp in processing, and that it was this which made it a jam; that, on the record before us, practically identical processing of strawberries did not reduce the strawberries to pulp; and that this reduction of fruit to pulp is the criterion for classification of processed fruits as jam.

The cases that were decided under earlier statutes, construing different enumerations, are not particularly helpful in resolving the problem that is before us now. Prior to the 1922 act, there was no tariff enumeration for jams, although there was a tariff enumeration for jellies. (Tariff Act of 1909, par. 274; Tariff Act of 1913, par. 217.) The 1909 and 1913 acts made enumerated provision for edible fruits, including berries, "preserved or packed in sugar." (Tariff Act of 1909, par 274; Tariff Act of 1913, par. 217.) In the 1922 and 1930 acts, edible berries, prepared or preserved, and not specially provided for, were classified in a separate provision from fruits. (Tariff Act of 1922, par. 736; Tariff Act of 1930, par. 736.)

In construing the classification status, under acts prior to the 1922 act, of imported merchandise described as fruit jams or fruit preserves, the courts held that these were not jellies, and that they were more correctly described by the tariff enumeration for fruits preserved in sugar. The issue now before us did not arise under the earlier acts, as our appeals court indicated in *Bogle* v. *United States*, 1 Ct. Cust. Appls. 144, T.D. 31188, a case in which marmalade and berry jam were the merchandise before the court.

The trial court had overruled the importer's claim that marmalade and berry jam are the article of commerce that is enumerated as jellies. The appeals court affirmed, saying:

\* \* \* Witnesses of long experience in the manufacture and sale of marmalades, jellies, and preserved fruits of all kinds recognize the distinction already pointed out, and say that marmalade is not bought and sold as a jelly; that it is known as having the pulp of the fruit in it, while jelly is the fruit juice strained to remove the fruit particles. Thus we have a case where the uniform and generally accepted meaning of words and well-understood trade meanings harmonize with substantial unity.

We need not dwell upon the argument of the appellants that marmalade is not properly a fruit preserved in sugar, as included in section 263 (supra), for it is so clearly a sweetmeat that we can well rest our decision upon a finding that it should be classified accordingly. The Century Dictionary defines a sweetmeat as "fruit preserved with sugar, either moist or dry; a conserve; a preserve; usually in the plural." The fact that there is a bittersweet taste to marmalade does not exclude it from the definition of a sweetmeat any more than would

ginger boiled in sugar be excluded from within that term. And that ginger so treated is a sweetmeat has already be decided by this court in R. M. Delapenha & Co. *v.* United States (supra, p. 113, T.D. 31116.)

Much of what we have just said applies to the jams involved in the present case. They are not jellies, but are conserves of fruit prepared by boiling the fruits with sugar to a pulp. While we think jams might well be called fruits preserved in sugar (Habicht *v.* United States, supra, p. 10, T.D. 30772), or perserves, under the weight of the evidence they are so clearly sweetmeats, and therefore subject to the same rates of duty imposed upon fruits preserved in sugar, that it becomes unimportant to analyze the testimony of one of the witnesses who attempted to make a distinction between fruits preserved and fruit preserve. [Pp. 145, 146.]

The Tariff Act of 1930 has no enumeration for sweetmeats. That enumeration, found in earlier acts, was eliminated in the 1922 act.

It is the common meaning of the word jam on which plaintiffs rely. (Plaintiffs' brief, p. 5.) Common meaning is a question of law for the court to find with the help of dictionaries and other aids to interpretation. *United States* v. *Mercantil Distribuidora et al.,* 43 CCPA 111, C.A.D. 617.

In Webster's New International Dictionary, second edition, 1956, jam is defined as "A product made by boiling fruit and sugar to a thick consistency, without preserving the shape of the fruit; as, raspberry *jam.*" Indeed, the semantics of derivation of the word suggest that a fruit jam is a fruit preserve in which the fruit is jammed, that is, crowded, caught fast, and crushed or bruised.

According to the same lexicographic authority, the old meaning of the noun "preserve," as a thing which is preserved, is now obsolete except in two specific senses, one of which uses the noun in the singular and the other uses it in the plural. These are: "a Fruit canned or made into jams, jellies, or the like;—commonly in *pl.;* as, a store of *preserves.* b Fruit cooked with sugar so as to keep its shape; as, plum *preserve.*"

Here the product is described in the plural, i.e., *preserves.* It is not a jam in the precise dictionary sense, for the shape of the strawberries is kept. They are not crushed or reduced to a pulp.

In a well-known book for cooks, called the New Fannie Farmer Boston Cooking School Cook Book, 9th edition, there appears (p. 771) the following definitions:

Jam or Marmalade. Fruit cut in small pieces, cooked with sirup until jellylike.

\* \* \* \* \* \* \*

Preserves. Fruit canned in a sugar sirup, thinner than for jam. The fruit is usually left whole or in fairly large pieces.

Here the product partakes partly of the nature of a jam (the syrup is not thinner) and partly not (the fruit is mostly left whole).

To be sure, the Food and Drug Administration has prescribed its common standard for fruit preserves and jams. The Summaries of

Tariff Information, 1929 (schedule 7, at page 1300) and 1948 (volume 7, part 4, page 170), recite data as to both. We accept these as evidence that is to be weighed with other evidence. *United States* v. *J. H. Brown et al.*, 46 CCPA 1, C.A.D. 686.

Unlike the *Allied Food* case, *supra*, there is no possibility here of classification of these strawberry preserves as jam, by similitude of use, although the record shows similitude of use. If this is not a jam, the product is edible berries, prepared or preserved (paragraph 736), and not an unenumerated article susceptible to similitude classification.

The difficulty is that plaintiffs have not presented their case as turning on a commercial designation different from the common, or dictionary, meaning of jam. There may be a commercial meaning; but if there is, the proofs plaintiffs have adduced do not show it. Failing such proofs, and in the light of the lexicographic definition of jams, we find that plaintiffs have not overcome the presumption of correctness that attaches to the collector's classification.

The protests are overruled. Judgment will be entered accordingly.